IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL NUNEZ, | No. CIV S-09-1975-CMK |
| Plaintiff, | |
| vs. | MEMORANDUM OPINION AND ORDER |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |
| _____/ | |

Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment. See 28 U.S.C. § 636(c). Pending before the court are plaintiff's motion for summary judgment (Doc. 25) and defendant's cross-motion for summary judgment (Doc. 28).

/ / /

/ / /

/ / /

## I. PROCEDURAL HISTORY

Plaintiff applied for social security benefits on November 14, 2006. In the application, plaintiff claims that disability began on March 1, 2002. Plaintiff claims that disability is caused by a combination of "left upper extremity injury with a poorly healed left hand fracture, degenerative arthritis, obesity, peripheral neuropathy, depression, and Hepatitis C" which cause "debilitating symptoms including chronic pain, manipulative limitations, sit/stand/walk limitations, postural limitations, difficulty sleeping at night, the need for day time naps, and left hand neuropathy." Plaintiff's claim was initially denied. Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on October 23, 2008, before Administrative Law Judge ("ALJ") Peter F. Belli. In a February 4, 2009, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

1. The claimant has the following severe impairments: status post right knee arthroscopy and meniscectomy, status post left wrist fractures, and obesity;

2. The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3. The claimant has the following residual functional capacity: claimant can perform light work except that he can lift, carry, push, and pull 10 pounds frequently and 20 pounds occasionally with the right hand, 10 pounds frequently and occasionally with the left hand, which can be used as a helper, sit for 8 hours with normal breaks, stand 8 hours with normal breaks, not work at unprotected heights or around dangerous machinery, and there are no limits on grasping and fingering with the right hand while occasional to frequent grasping and fingering can be done with the left; and

4. The claimant is capable of performing his past relevant work involving quality assurance and CAD (computer-aided design).

After the Appeals Council declined review on May 20, 2009, this appeal followed.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

<u>October 19, 1995</u> – Records from Ventura County Medical Center indicate that plaintiff underwent a left knee arthroscopy with partial medial meniscectomy.  The post-operative diagnosis was right knee medial meniscal tear and significant interarticular synovitis of the right knee.

<u>April 16, 2002</u> – Records from Plastic and Reconstructive Surgery Associates reveal that, on physical examination, the left hand and arm were moderately swollen.  At the time, the hand was too swollen to allow palpation of any foreign bodies which may have been in the dorsum of the left hand.  The doctor's plan was to refer plaintiff to an orthopedic surgeon for further evaluation.

<u>April 22, 2002</u> – Plaintiff returned to Plastic and Reconstructive Surgery Associates after obtaining x-rays of the left hand and wrist.  According to the doctor, the x-rays showed:

> It shows what appears to be non displaced fracture of the base of the third, fourth, and fifth metacarpals, as well as a possible foreign body or bone fracture fragment over the dorsum of the hand. . . .  He also has a non-displaced ulnar styloid fracture. . . .

The doctor explained the risks and benefits of surgery, which plaintiff wanted to pursue.

<u>April 26, 2002</u> – Records from San Jose Medical Center reflect that plaintiff underwent a procedure performed by Vincent D. Lepore, M.D., to explore the left dorsal hand and remove a fracture fragment.  The post-operative diagnosis was left hand trauma with multiple metacarpal base fractures and fracture fragment and/or possible foreign body of dorsum of hand.

/ / /

/ / /

/ / /

<u>June 25, 2002</u> – Records from Plastic and Reconstructive Surgery Associates reveal the following entry by Dr. Lepore:

> His hand incision is healing well. His hand range of motion from his fracture has been gradually improving. . . . From my standpoint, the patient could return to regular duty work. . . .

<u>July 22, 2002</u> – Hand therapist Shari Prater prepared a progress report following nine therapy sessions with plaintiff. Subjectively, Ms. Prater noted that plaintiff's dorsal left wrist was painful and that plaintiff was unable to make a full fist with the left hand. He also had difficulty lifting items because he was unable to oppose the thumb to the small finger. Plaintiff's index finger was also painful with use. On objective testing of range of motion, Ms. Prater opined that plaintiff was not able to lift more than 10 pounds with the left hand.

<u>February 7, 2005</u> – Radiological testing of plaintiff's left wrist revealed no acute fracture or dislocation, no destructive lesions, and no acute abnormality.

<u>February 17, 2005</u> – Medical records indicate that plaintiff was receiving treatment for Hepatitis C. This record is notable for the following:

> ASSESSMENT AND PLAN:
>
> 1. Hepatitis C, chronic. His genotype is 1B and viral load 224,000. I will work on getting him to stop drug use and then consider a referral to Gastroenterology for possible treatment of Hepatitis.
>
> 2. Crack cocaine dependency. I highly suggested he quit. He said he called the numbers for assistance and drug use and said the people he talked to sounded like they are on drugs so he was not too impressed with those people contacting him. I told him I would look into counseling services a bit more for him.
>
> 3. Alcohol use. Discussed the need to stop alcohol use as well.

<u>February 25, 2005</u> – The CAR contains a report of a radiological study of plaintiff's abdomen as part of his treatment for Hepatitis. The doctor noted a small subcapsular cyst but stated that the liver was otherwise unremarkable.

/ / /

/ / /

September 7, 2006 – Family Nurse Practitioner Carol Ralli prepared a chart note. Subjectively, Ms. Ralli noted the following:

> This is a 52-year-old gentleman coming in to the clinic for the first time from San Jose. In 2002, he was in motor vehicle accident where [he] sustained a crush injury to the left hand with a long piece of metal jabbing into his left hand and having surgery but the tendons are injured in the hand and up into the arm as well. He has decreased mobility and evidently nerve damage where he is unable to sustain a grip and is having pain up in to his left shoulder as well. He comes into the clinic today with a plethora of papers but not all of his medical records pertinent to the injury and the surgery, has had multiple exams determining extent of mobility for his hand, has applied in the past for SSI and permanent disability [which] was denied with multiple appeals. He is interested in rehabilitation due to the fact that he is unable to use the left hand with any type of security. The patient is right handed. He would like a GR Form filled out today. He is currently on no medications. He denies drugs, alcohol, or tobacco use presently and other contributory past medical illnesses.

Objectively, Ms. Ralli noted that plaintiff's weight was 251 pounds. She also noted that plaintiff was able to dorsiflex his wrist but that his muscle strength was "less than 5/5."

October 10, 2006 – A letter from Progress Rail Services indicates that plaintiff had been made a conditional offer of employment subject to review of certain medical records relating to his left wrist/arm/hand.

January 25, 2007 – Agency examining physician Janet O'Brien, M.D., performed a comprehensive internal medicine evaluation. Plaintiff's chief complaints were Hepatitis C, knee problems, and left arm injury. Regarding his Hepatitis, plaintiff indicated that he has not received any treatment for the condition, and that he has no symptoms related to the condition. Regarding his knee problems, the doctor noted the following objective complaints:

> . . . He believes that the problem is with his right knee, although it could be his left. He had surgery on the knee and indicates the medial aspect of the right knee. He has throbbing in that area which occurs when the knee is in a certain position; he will have to move his right leg to reposition the knee. The sensation is of varying intensity.

As to his left arm injury, plaintiff reported:

> . . . In 2002 he had an injury to the left upper extremity and indicates the left forearm. This was "crushed under a truck." The left wrist was surgically fused. He is able to use a hammer with his right hand, but is

unable to feel where the nail is with his left hand. He notes that he is
always injuring his left hand because of difficulty with sensation. He
believes that he would be unable to carry, for example, a chair with the left
hand. If the weather is cold, his left wrist hurts. If he leans on the left arm,
his left hand will fall asleep. If he makes a fist with the left hand and hits
something, his left hand and wrist will ache. He used to be able to hold
concrete forms in his job, but now feels that he would be unable to do this
because they would slip out of his fingers in the left hand.

Plaintiff also reported that he could only walk for up to an hour before needing to rest. As to other impacts on daily living, the doctor noted:

> . . . He reports that he can't do household chores well, so he does not start them. He is unable to pursue his former employment in construction because of decreased grip strength on the left; he notes that he used to pour concrete but is unable to do this any longer. He also notes that at one point he was promised a job, but when they found out about his left upper extremity, the offer was withdrawn. He notes that he lost his wife in May 2006 to cancer. During the day he wants to sleep because he tends to stay up at night reading or watching television. He does no cooking because he is afraid of the heat; he notes that he would not feel a burn to his left upper extremity. He does dishes but worries about the hot water. He does the laundry. He does no grocery shopping, saying "it seems too demanding to be going out there." He also notes that he has difficulty doing a lot of walking, stooping, and bending.

On physical examination, the doctor noted that plaintiff was not in any acute distress and demonstrated no guarding with moving about the examination room. In fact, the doctor commented that plaintiff "moves briskly." Plaintiff demonstrated no difficulty removing his shoes and socks or in getting on the examination table. Flexion in plaintiff's knees was 100 on the right and 95 on the left, with 150 being normal. Extension in both knees was normal. Flexion in the right wrist was 40 with 60 being normal. Extension was normal in the right wrist. Flexion and extension were both significantly reduced from normal in the left wrist. As to dexterity, the doctor noted that fingertips and thumbs were fully opposable bilaterally and that plaintiff moved his left hand well. Grip strength was weaker on the left than the right. Dr. O'Brien outlined the following functional assessment:

> The claimant should be able to stand and walk 6 hours in an 8-hour day.

///

> The claimant should be able to ambulate as needed for banking, shopping, and traveling to and from work or school. He should be able to walk a block over rough or uneven surfaces. He should be able to use public transportation. He should be able to climb a few steps with the use of a handrail.
>
> The claimant should be able to sit 6 hours in an 8-hour day.
>
> Assistive device: none.
>
> The claimant should be able to lift and carry 25 pounds frequently and 50 pounds occasionally, limited by decreased left grip strength.
>
> Postural limitations: The claimant should be able to stoop, crouch, kneel, and climb 6 hours in an 8-hour day.
>
> Manipulative limitations: The claimant should be able to reach, handle, grasp, feel, and finger without limitation bilaterally, although power gripping with the left hand will be limited as above.
>
> There are no visual or communicative limitations. Because of his history of Hepatitis C, the claimant should not be in a workplace environment in which blood-to-blood transfer is likely.

February 21, 2007 – Agency consultative physician M.L. Tambellini, M.D., completed a physical residual functional capacity assessment based on review of medical records. The doctor opined that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. Plaintiff was assessed as having the ability to sit/stand/walk for 6 hours in an 8-hour day. Plaintiff's ability to push/pull was unlimited. The doctor concluded that plaintiff could occasionally climb ramps/stairs, kneel, crouch, and crawl, and that plaintiff could frequently stoop and balance. Plaintiff should never climb ladders/ropes/scaffolds. As to manipulative limitations, the doctor opined that plaintiff's ability to reach in all directions is unlimited, but plaintiff is limited in his gross and fine manipulative abilities. This limitation applied only to left hand fingering and gripping on a frequent basis (i.e., no frequent fingering or gripping with the left hand). No visual, postural, or environmental limitations were noted.

/ / /

/ / /

/ / /

<u>June 1, 2007</u> – Plaintiff submitted an Exertional Daly Activities Questionnaire. Plaintiff stated that he lives with a caretaker. He stated that he fatigued "very quickly" with any activity. He added that climbing the ten stairs to his apartment caused weakness. Plaintiff also stated that he does no house work or yard work of any kind. According to plaintiff, he requires the use of a brace and cane. Plaintiff said that he was unable to complete even simple tasks.

<u>January 18, 2008</u> – Plaintiff's treating physician, George M. Scarmon, M.D., prepared chart notes indicating, objectively, that plaintiff has weak grip strength of the left hand.

<u>January 21, 2008</u> – Dr. Scarmon prepared additional chart notes. Subjectively, the doctor noted that plaintiff complained of "severe degenerative arthritis, pain in both arms and legs." Objectively, Dr. Scarmon noted only plaintiff's weight (251 pounds), temperature, pulse, and blood pressure. The doctor did not make any notations on physical examination regarding plaintiff's specific complaints.

<u>February 8, 2008 & August 22, 2008</u> – While these records are somewhat difficult to read, the CAR contains two nearly identical Medical Assessments completed by Dr. Scarmon. The doctor opined that plaintiff could lift/carry less than 10 pounds. He opined that plaintiff could stand/walk for only 1/2 hour without interruption, up to a total of 3-4 hours in an 8-hour day. Dr. Scarmon assessed the same limitation as to plaintiff's ability to sit. The doctor concluded that plaintiff could never do any postural activities (i.e., bending, climbing, etc.). The doctor opined that plaintiff's ability to reach, handle, feel, push, and pull were all limited by plaintiff's condition. For medical findings supporting these conclusions, Dr. Scarmon generally noted "severe pain." No specific objective findings are noted.

///
///
///
///

### III. STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole. See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999). "Substantial evidence" is more than a mere scintilla, but less than a preponderance. See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996). It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 402 (1971). The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed. See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence. See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989). If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive. See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987). Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

### IV. DISCUSSION

In his motion for summary judgment, plaintiff argues: (1) the ALJ rejected the treating doctor's opinion without providing sufficient reasons for doing so; (2) the ALJ failed to properly evaluate plaintiff's obesity; and (3) the ALJ relied on vocation expert testimony in response to hypothetical questions that did not accurately describe plaintiff.

/ / /

/ / /

### A. Evaluation of Treating Doctor's Opinion

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals. See Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual, than the opinion of a non-treating professional. See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987). The least weight is given to the opinion of a non-examining professional. See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th Cir. 1990).

In addition to considering its source, to evaluate whether the Commissioner properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in the record; and (2) clinical findings support the opinions. The Commissioner may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons supported by substantial evidence in the record. See Lester, 81 F.3d at 831. While a treating professional's opinion generally is accorded superior weight, if it is contradicted by an examining professional's opinion which is supported by different independent clinical findings, the Commissioner may resolve the conflict. See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995). A contradicted opinion of a treating or examining professional may be rejected only for "specific and legitimate" reasons supported by substantial evidence. See Lester, 81 F.3d at 830. This test is met if the Commissioner sets out a detailed and thorough summary of the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a finding. See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989). Absent specific and legitimate reasons, the Commissioner must defer to the opinion of a treating or examining professional. See Lester, 81 F.3d at 830-31. The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional. See id. at 831. In any event, the Commissioner need not give weight to any

1 conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2 1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see

3 also Magallanes, 881 F.2d at 751.

4    As to plaintiff's treating physician – Dr. Scarmon – the ALJ stated:

> . . . Records from George Scarmon, M.D., indicate the claimant was seen on a few occasions, beginning in September 2007, for complaints of left elbow pain that was considered to be neuropathic for which he was given prescriptive and over-the-counter anti-inflammatory [medications].  In January 2008, he returned to Dr. Scarmon for a disability evaluation and was found to have a weak left hand grip and degenerative changes of the knees (Ex. 48F).
>
> * * *
>
> . . . The medical source statement from Dr. Scarmon, which purports to restrict the claimant to lifting less than 10 pounds, standing less than an hour, sitting only 1/2 hour, and otherwise preventing even sedentary exertion, simply cannot be credited due to its lack of support with the physician's own records of treatment or the record as a whole (Ex. 48F/5, 6).  Indeed, there is very little clinical support from Dr. Scarmon. . . .

14 Plaintiff argues in general that the ALJ failed to articulate sufficient reasons for rejecting Dr.

15 Scarmon's opinion.  More specifically, plaintiff asserts that the ALJ's summary of Dr. Scarmon's

16 assessed limitations is inaccurate.

17    The court finds no error.  In particular, the court agrees with the ALJ's statement

18 that there is little clinical support for Dr. Scarmon's opinions.  In fact, there is virtually no

19 support.  Dr. Scarmon's chart notes from January 18, 2008, reflect only weak grip strength of the

20 left hand.  But, no objective data is provided to indicate the extent of this limitation.  The January

21 21, 2008, chart note is devoid of any objective findings.  As to the two medical source statements,

22 neither detailed objective findings.  Instead, the doctor noted only plaintiff's subjective complaints

23 of pain.  The ALJ did not err in rejecting Dr. Scarmon's conclusory and unsupported opinions.

24 / / /

25 / / /

26 / / /

**B.     Obesity**

In 1999, obesity was removed from the Listing of Impairments.[1]  Obesity may still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181 n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to consider obesity in a multiple impairment analysis, but only where it is "clear from the record that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that a multiple impairment analysis is not required where "the medical record is silent as to whether and how claimant's obesity might have exacerbated her condition" and "the claimant did not present any testimony or other evidence . . . that her obesity impaired her ability to work").  Where a multiple impairment analysis is not required, the ALJ properly considers obesity by acknowledging the plaintiff's weight in making determinations throughout the sequential analysis.  See Burch, 400 F.3d at 684.

As to plaintiff's obesity, the ALJ stated:

> . . . Examination by Family Nurse Practitioner Carol Ralli, on September 7, 2006, indicates he was right-handed, taking no medications, and weighing 251 pounds.  He was able to grip his left hand but its strength was still less than 5/5 (Exs.  5F, 29F).  During January 2006 consultative examination the claimant demonstrated no guarding with movement, no difficulty walking, sitting, removing his shoes and socks, or with getting onto the examination [table].  He weighed 254 pounds at 68 inches in height.  There was decreased left wrist motion and strength, though it was considered adequate for many tasks.  There was no muscle wasting or abnormal coordination, station, or gait.  He complained of right knee pain but he was able to squat and rise without difficulty and there was no knee crepitus or evidence of peripheral vascular disease.  The assessment was that he could stand and walk 6 of 8 hours, sit a similar amount, and reach, grasp, feel, and finger without limit except left hand power gripping (Ex. 34F). . . .
>
>         * * *

---

[1]      Under SSR 02-01p, a person with body mass index ("BMI") of 30 or above is considered obese.  BMI is the ratio of an individual's weight in kilograms to the square of height in meters (weight divided by square of height).

> . . . At 5 feet, 8 inches in height and 248 pounds, the claimant's body mass index (BMI) is about 38, which does not fall within the most severe, or "extreme" level of obesity (indicated by a BMI of 40 or higher, *see* SSR 02-1p). The evidence also does not demonstrate cardiovascular disease, stroke, or other associated abnormality that would be indicative of a level of severity equivalent to the medical listings. . . .

Regarding this discussion, plaintiff argues:

> The ALJ failed to properly evaluate Mr. Nunez's obesity under SSR 02-01p. He acknowledged that Mr. Nunez suffered from the severe impairment of obesity yet failed to properly assess his obesity as required by SSR 02-01p. This ruling recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards. Indeed, "obesity causes osteoarthritis by increasing the mechanical stress on the cartilage. In fact, next to aging, obesity is the most powerful risk factor for osteoarthritis of the knees." (citation to Internet address omitted). The ruling further states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "in cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity." *See* SSR 02-01p.
> Unfortunately, the ALJ only noted that at 248 pounds Mr. Nunez's obesity did not fall within the most "extreme" level of obesity and that "the evidence also does not demonstrate cardiovascular disease, stroke, or other associated abnormality that would be indicative of a level of severity equivalent to the medical listings." (footnote omitted). Given Mr. Nunez's impairments, including chronic severe right knee pain and degenerative arthritis it was incumbent upon the ALJ to properly assess the additional impact of his obesity on his ability to function in a sustained manner.

The court does not agree with plaintiff's analysis. The ALJ was not required to conduct a multiple impairment analysis, as plaintiff suggests, because there is no evidence that plaintiff's obesity exacerbated his other conditions. The ALJ properly considered plaintiff's weight by noting his weight throughout the sequential analysis.

      **C.**    **Hypothetical Questions**

The ALJ may meet his burden under step five of the sequential analysis by propounding to a vocational expert hypothetical questions based on medical assumptions, supported by substantial evidence, that reflect all the plaintiff's limitations. See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995). Specifically, where the Medical-Vocational Guidelines

13

are inapplicable because the plaintiff has sufficient non-exertional limitations, the ALJ is required to obtain vocational expert testimony. See Burkhart v. Bowen, 587 F.2d 1335, 1341 (9th Cir. 1988).

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant. See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989). If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value. See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991). While the ALJ may pose to the expert a range of hypothetical questions based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole. See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

Plaintiff argues:

> Notwithstanding the substantial evidence of Mr. Nunez's function limitations, the ALJ found that Mr. Nunez had the residual functional capacity to "perform light work" with occasional to frequent handling, fingering, and feeling on the left. In reaching this RFC determination, the ALJ rejected the credible limitations assessed by Dr. Scarmon, Mr. Nunez's treating physician. *See* Argument I above. As a result, the RFC assessed by the ALJ failed to include any of the credible limitations assessed by Dr. Scarmon as required by law. . . . As briefed above, the ALJ failed to articulate legitimate reasons for rejecting the limitations assessed by treating physician Dr. Scarmon. Consequently, the limitations assessed by Dr. Scarmon should have been included in the hypothetical posed to the VE.
>
> Although the hypotheticals posed by the ALJ failed to reflect Dr. Scarmon's assessed limitations, attorney Stassinos posed a hypothetical based entirely on Dr. Scarmon's RFC. In response to this hypothetical, the VE testified that full time work would be eliminated. TR 59. Had the ALJ credited the testimony of the VE in response to the hypothetical which accurately reflected Mr. Nunez's limitations [i.e., Dr. Scarmon's limitations], a finding of disabled would have followed.

Plaintiff's argument as to hypothetical questions necessarily builds upon his argument that the ALJ erred with respect to Dr. Scarmon. As discussed above, the court finds no error with respect to the ALJ's analysis of Dr. Scarmon's unsupported and conclusory opinions. Therefor, the ALJ

14

did not err by excluding Dr. Scarmon's assessed limitations. The ALJ was correct in rejecting the vocational expert's answers to counsel's hypothetical question based on Dr. Scarmon's limitations.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis. Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiff's motion for summary judgment (Doc. 25) is denied;
2. Defendant's cross-motion for summary judgment (Doc. 28) is granted; and
3. The Clerk of the Court is directed to enter judgment and close this file.

DATED: March 23, 2011

　　　　　　　　　　　　　　　　　　　　　　　
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE